# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CIVIL ACTION NO. 5:18-CV-00180-KDB-DSC

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| **Plaintiff,** | |
| **And** | |
| SHANA KNOX, | |
| **Intervenor,** | |
| v. | **ORDER** |
| JOE'S OLD FASHIONED BAR-B-QUE, INC. D/B/A LANCASTER'S BBQ &WINGS, | |
| **Defendant.** | |

**THIS MATTER** is before the Court on Defendant Joe's Old Fashioned Bar-B-Que, Inc. d/b/a Lancaster's BBQ & Wings' ("Lancaster's") motions for partial summary judgment. (Doc. Nos. 30, 31). This is an employment discrimination suit brought by the Equal Employment Opportunity Commission ("EEOC") and Intervenor Shana Knox ("Knox"). Knox, an African American female, worked at Lancaster's until January 2017 when she alleges that she was constructively discharged. The EEOC brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and Title I of the Civil Rights Act of 1991. Knox filed a Complaint in Intervention alleging claims for violations of Title VII and various state law claims. Lancaster's has filed two partial summary judgment motions seeking to dismiss the EEOC's claim for punitive damages and Knox's claims for battery, intentional infliction of emotional distress ("IIED"), and punitive damages.

1

For the reasons discussed below, the Court will grant both of Lancaster's motions. As a matter of law, Lancaster's is entitled to summary judgment on Knox's state law claims for battery and IIED because she cannot show that the actions of the offending employee were committed within the scope of his employment or were ratified by Lancaster's. Lancaster's is also entitled to summary judgment on the EEOC's and Knox's punitive damages claims. This matter will proceed to trial on the EEOC's and Knox's claims for compensatory damages under federal law and Knox's state law claim for negligent hiring, retention, and supervision.[1]

## I.    FACTS & PROCEDURAL HISTORY

Lancaster's is a local, family-owned restaurant that serves casual food such as sandwiches, burgers, salads, and barbeque. On March 4, 2016, Lancaster's hired Knox to work in the carryout portion of its Rinehardt Road restaurant located in Mooresville, North Carolina. Knox occasionally worked in carryout with a man named Christopher Bishop ("Bishop"). Bishop began working at Lancaster's in 2013 and was hired to work mainly "front-of-the-house duties," such as assisting servers with setting plates and delivering food, but occasionally worked in the carryout department with Knox. Knox's interactions with Bishop, and how those interactions were handled by Lancaster's management, are at the center of this lawsuit.

Knox claims that Bishop racially discriminated against her on more than twenty occasions during her time at Lancaster's. Knox claims that she reported "maybe six" of these instances to management. However, when asked to further detail these reports at her deposition, Knox could only describe two occasions where she reported Bishop's behavior to a manager. The first incident

---

[1] This matter is currently scheduled for the Court's July 20, 2020 trial term. With respect to a potential resolution of this matter between the parties, the filing of this Order does not relive the parties of their obligation to hold a Settlement Conference following the briefing of a motion for Summary Judgment and to file a certification of the conference with the Court pursuant to the Court's standing Pretrial Order and Case Management Plan at ¶ IV A, C.

Knox recalled reporting to Lancaster's management involved Bishop walking past her and mummering racial epithets towards Knox under his breath. Knox claims that she reported Bishop's behavior to general manager Josh Davis ("Davis").[2] Davis allegedly told Knox that he would "handle it," but Knox is unaware of any action Davis took to address her complaint.

The second instance in which Knox recalled reporting Bishop's behavior to management is when Bishop told her jokes where the punchline included racial slurs. Knox claims she reported this to front-of-the-house manager Terri Dave ("Dave"). When questioned further about what she told Dave, Knox stated that she asked Dave, "Do you feel like Chris is acting racist?" Dave replied, "No, I don't think he's racist. Chris just plays around a lot." While Knox claims she reported Bishop's behavior other times, she could not recall the specifics of any other reports. She does allege that she reported Bishop's behavior to a third manager, Cheri Bishop (kitchen manager in charge of the carryout area and Bishop's mother), and recalls that Cheri Bishop would tell her son to "shut up," but does not recall any other specifics.

Bishop's behavior towards Knox culminated in an explosive outburst on January 20, 2017. On that day, Bishop repeatedly placed things in Knox's cup of ice, causing her to have to make herself several new cups of ice. Knox asked Cheri Bishop to tell Bishop to stop putting things in her cup. Minutes after Knox went back to work, Bishop approached Knox, put spicy dip in her cup, poured sauce on her, hit her with a pan, called Knox a racial slur, and yelled other outrageous racially charged remarks.

Moments after the altercation, Dave entered the kitchen and immediately went to get Davis, who was in his office at the time. Dave rushed to Knox's side and asked her what happened. After

---

[2] Davis denies that Knox ever reported such behavior.

hearing Knox's side of the story, Dave asked Bishop if he had used a racial slur. Bishop admitted that he had. Dave immediately terminated Bishop and Knox was given the rest of the day off.

Later that day, Cheri Bishop and Davis called Knox to apologize for Bishop's actions and asked Knox to come back to work. Knox did not return to work at Lancaster's after the January 20, 2017 incident, claiming that she felt she had no other choice but to quit because Lancaster's failed to exercise control over Bishop. Approximately four months later, Lancaster's re-hired Bishop, allegedly placing him on six months' probation upon his return. Bishop was fired for a final time in 2018 after the EEOC issued its investigative cause determination finding that a violation of Title VII had occurred.

Bishop's personnel file shows several write-ups for issues ranging from incorrect food preparation to insubordination, but there are no write-ups or documented instances regarding prior assaults, battery, or racially motivated conduct in his file. Bishop's file does show that he had been previously fired on May 1, 2016 for insubordination. And, although not contained in his personnel file, the parties agree there was a prior incident where Bishop had called Lancaster's Mexican kitchen staff a racial slur. Bishop's comments to the kitchen staff were reported to management and Bishop was "counseled" by Lancaster's owner and another supervisor who told him to never use the term again. There is no evidence that Bishop used the term again until after Knox claims she was constructively discharged.

Lancaster's has a written equal employment policy that reads as follows:

> Lancaster's BBQ is an Equal Opportunity Employer. This means that we will extend equal opportunity to all individual [sic] without regard for race, religion, color, sex, and national origin, disability, handicaps or veterans [sic] status. This policy affirms Lancaster's BBQ [sic] commitment to the principles of fair employment and the elimination of all vestiges of discriminatory practices that might exist. We encourage all employee [sic] to take advantage of opportunities for promotion as they occur.

(Doc. No. 34-8, at 6).

On November 11, 2019, the EEOC brought this action under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and Title I of the Civil Rights Act of 1991. In its Complaint, the EEOC alleges that (1) Lancaster's subjected Knox to a hostile work environment based on her race, which resulted in her constructive discharge, and (2) Lancaster's failed to make and preserve records as required under Section 709(c) of Title VII. (Doc. No. 1). The EEOC seeks punitive damages. On July 11, 2019, Knox filed a Complaint in Intervention alleging claims for violations of Title VII of the Civil Rights Act for subjecting her to a hostile work environment, violations of Section 1981 of the Civil Rights Act of 1866 for subjecting Knox to a hostile work environment, battery, IIED, and negligent hiring, retention, and supervision. (Doc. No. 16). Lancaster's filed the two partial summary judgment motions now before the Court on April 17, 2020, seeking summary judgment on the EEOC's claim for punitive damages (Doc. No. 31) and on Knox's claims for battery, IIED, and punitive damages (Doc. No. 30). The Court held oral arguments on the motions on June 4, 2020.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co*., *et al*., 946 F.3d 201, 206 (4th Cir. 2019).

A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law."

*Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)**.** "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," *Id*. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id*. at 324.

In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores,* 888 F.3d at 659 (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). "Only disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id*. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id*. at 249-50.

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

## III.    DISCUSSION

Lancaster's partial motions for summary judgment seek to dismiss Knox's claims against Lancaster's for the intentional torts of battery and IIED, arguing that Knox cannot show that Bishop's actions were authorized, ratified, or within the scope of his employment. Lancaster's also seeks to dismiss both the EEOC's and Knox's claims for punitive damages.

### A.  Intentional Torts

Knox claims that she was battered by Bishop on January 20, 2017 when he threw barbeque sauce on her and hit her with a pan. Knox also contends that Bishop's conduct throughout her time at Lancaster's was done "with the intent to cause Knox severe mental pain and emotional distress, or with reckless indifference to the likelihood that such behavior would cause severe emotional distress." (Doc. No. 16, at ¶ 70). Knox argues that Lancaster's is liable for Bishop's tortious conduct because it was committed within the scope of his employment and was subsequently ratified by Lancaster's.

"As a general rule, liability of a principal for the torts of his agent may arise in three situations: (1) when the agent's act is expressly authorized by the principal; (2) when the agent's act is

committed within the scope of his employment and in furtherance of the principal's business; or (3) when the agent's act is ratified by the principal." *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 121 (N.C. Ct. App. 1986), *disc. rev. denied*, 346 S.E.2d 140 (N.C. 1986); *see also Stanley v. Brooks*, 436 S.E.2d 272, 274 (N.C. Ct. App. 1993). For Knox to recover on her theory of vicarious liability, she must establish that Bishop's actions and the conduct of Lancaster's falls into one of the aforementioned categories. There is no indication, and Knox does not contend, that Bishop's conduct was expressly authorized by Lancaster's. Therefore, whether or not Lancaster's is vicariously liable turns on whether Bishop was acting within the course and scope of his employment or his conduct was "ratified" by Lancaster's.

"Intentional tortious acts are rarely considered to be within the scope of an employee's employment." *Brown v. Burlington Industries, Inc.*, 378 S.E.2d 232, 235 (N.C. Ct. App. 1989). "To be within the scope of employment, an employee, at the time of the incident, must be acting in furtherance of the principal's business and for the purpose of accomplishing the duties of his employment." *B.B. Walker Co. v. Burns Int'l Sec. Servs., Inc.*, 424 S.E.2d 172, 174 (N.C. Ct. App. 1993). "'If an employee departs from that purpose to accomplish a purpose of his own, the principal is not [vicariously] liable.'" *Id.* (quoting *Troxler v. Charter Mandala Center*, 365 S.E.2d 665 (N.C. Ct. App. 1988)).

Knox argues that because Bishop's duties involved "fixing food," a reasonable jury could conclude that Bishop "was acting within the scope of his employment when, while he was fixing food and pouring barbeque sauce, he also drenched Knox in barbeque sauce." (Doc. No. 34, at 13). The Court is unpersuaded by this argument. Neither Bishop's explosive outburst nor his racial comments towards Knox were within the scope of his employment or in furtherance of Lancaster's business.

Thus, the EEOC and Knox are left to argue liability through the theory of ratification. In order to prove ratification, a plaintiff must establish that the "employer had knowledge of all material facts and circumstances relative to the wrongful acts, and that the employer, by words or conduct, show[ed] an intention to ratify the act." *Brown*, 378 S.E.2d at 236. Ratification can be shown by any course of conduct which reasonably tends to show an intention on the part of the principal/employer "to ratify the agent's unauthorized acts." *Id.* "This course of conduct may include a failure to act after being appri[s]ed of the material facts and circumstances to the wrongful conduct." *Watson v. Dixon*, 502 S.E.2d 15, 20 (N.C. Ct. App. 1998).

As to Knox's claim for battery, the Court finds that there is insufficient evidence from which a reasonable jury could conclude that Bishop's battery was ratified by Lancaster's. Bishop was fired immediately after the incident on January 20, 2017. The record reflects that it was Knox's version of the events that was accepted by the managers, not Bishop's. And, later that day, managers Cheri Bishop and Davis called Knox to apologize for Bishop's actions and asked her to return to work. At oral argument, counsel stated that the only evidence of ratification of the battery is Bishop's rehiring four months later and the circumstances surrounding Bishop's subsequent firing in 2018. The Court finds that this is insufficient to support ratification of Bishop's battery as a matter of law. As horrific as Bishop's conduct was, ruling that rehiring Bishop (even four months later and under probation) is a ratification of the earlier battery might effectively prevent Bishop from ever having an opportunity for a second chance to redeem this conduct.[3] The Court finds that there is insufficient evidence in the record for a reasonable jury to find that Lancaster's ratified Bishop's battery when he was immediately fired after the battery, managers at Lancaster's

---

[3] The Court does not and need not reach any broad holding beyond the narrow facts of this case regarding how soon and under what circumstances the rehiring of an employee who engaged in clearly inappropriate conduct might reflect a ratification of such conduct.

clearly expressed disapproval of his actions, Knox was unequivocally treated as the victim of the outburst and was asked to return to work.

Knox cites to only one case in support of her argument that Lancaster's ratified Bishop's battery. However, the defendant's response to the harassment in the case cited by Knox is readily distinguishable from the response by Lancaster's management. *See Guthrie v. Conroy*, 567 S.E.2d 403 (N.C. Ct. App. 2002). In *Guthrie*, the North Carolina Court of Appeals held that the plaintiff had showed a genuine issue of material fact as to ratification of civil assault when the plaintiff's immediate supervisor failed to respond to multiple complaints, laughed and made a joke in response to one of plaintiff's assault complaints, and completely failed to address an incident where the offending employee threw soil and water on the plaintiff despite being aware of the situation. *Id.* at 412. In *Guthrie*, the local manager never once reprimanded the employee committing the assaults. In Knox's case, on the other hand, Bishop was terminated as soon as managers were made aware of the incident, which was only moments after it happened.

While ratification of Bishop's IIED is a closer call, the Court finds that Knox has failed to present evidence from which a reasonable jury could hold Lancaster's liable for Bishop's actions. In this Court's survey of the caselaw, North Carolina courts permitted vicarious liability claims for IIED only when the defendant failed to act in any way, rebuffed the plaintiff, or condoned the offending employee's actions after management became aware of the tortious conduct. *See, e.g.*, *Watson v. Dixon*, 502 S.E.2d 15 (N.C. Ct. App. 1998) (upholding a jury verdict finding that defendant Duke University had ratified the offending employee's actions constituting an IIED claim when the evidence showed that management knew of the employee's propensity to intimidate new employees, rebuffed plaintiff's reports of harassment with laughter, did nothing in response to multiple reports of harassment, retaliated against plaintiff for reporting the harassment,

told plaintiff to keep her mouth shut, and failed to report the offending employee's behavior in accordance with the University's written policy); *Poole v. Copeland*, 481 S.E.2d 88 (N.C. Ct. App. 1997), *rev'd on other grounds*, 498 S.E.2d 602 (N.C. 1998) (upholding a jury verdict finding that the defendant had ratified an employee's actions underlying an IIED claim when the plaintiff specifically reported multiple instances of sexual harassment, was told by her supervisor that the offending employee was "just a youngin,'" "to ignore him," and that the offending employee was "only picking" in response to her specific complaints, her superior witnessed the sexual harassment and laughed, and plaintiff was eventually fired); *Brown*, 378 S.E.2d at 236 (upholding a jury verdict finding that the defendant had ratified an employee's sexual harassment when the company had a policy requiring complaints of sexual harassment to be reported to higher authorities and the manager knew of the harassment but failed to report it); *Hogan*, 340 S.E.2d 116, 122 (holding that the question of ratification of employee's alleged harassment should be submitted to a jury when the defendant continued to employ the offending employee, declined to intervene to prevent further offensive behavior towards the plaintiff, and ultimately terminated the plaintiff from employment).

Here, the actions of Lancaster's management are in stark contrast to those in the cases cited by Knox. The undisputed evidence shows that Bishop was immediately terminated after battering and yelling racial slurs at Knox on January 20, 2017. When Knox complained of Bishop's actions, she was not rebuffed by management. Rather, it was her story that management immediately believed on January 20, 2017. Knox does not claim that she was ever ridiculed or retaliated against for her complaints about Bishop. And, when asked at her deposition who had racially profiled her and who was hostile to her while at work, Knox responded that it was only Bishop and no one else.

Moreover, Knox can only describe two of the six incidents in which she claims she reported Bishop's actions to management. She recalls reporting a specific instance of Bishop using a racial

slur towards her to general manager Davis. Davis never condoned Bishop's behavior and instead told Knox that he would "handle it." The second instance she recalls reporting Bishop's behavior is when she asked Dave whether she thought Bishop was being racist. Notably, Knox never gave Dave any specifics about Bishop's actions. For the four other instances in which Knox claims to have reported Bishop's conduct, she can provide no details of what happened, when it happened, who it was reported to, and what, if any, action Lancaster's took in response. Thus, the record shows that the one time Knox recalls reporting a specific instance to management, she was told management would take care of the situation. Accordingly, a reasonable jury could not find that Lancaster's ratified Bishop's conduct based on the bare assertion that Knox reported Bishop's conduct other times without any description or detail or simply as a consequence of his rehiring as discussed above.

### B.  Punitive Damages

The EEOC seeks punitive damages based on Lancaster's Title VII violations. Similarly, Knox asserts claims for punitive damages under Title VII and on her state law claims.

#### i.  *Title VII*

"Punitive damages are allowed in a Title VII action only under limited circumstances." *United States EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 151 (4th Cir. 2017). "Congress plainly sought to impose two standards of liability—one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999). Importantly, "the text and background of the Civil Rights Act of 1991, which authorizes punitive damages, emphasize that this extraordinary remedy is not to be awarded automatically in every successful Title VII suit." *Harris v. L&L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir. 1997).

Recently, the Fourth Circuit summarized the standard for punitive damages under Title VII in *Ward v. AutoZoners, LLC*, 958 F.3d 254 (4th Cir. 2020). In *Ward*, the plaintiff complained of sexual harassment by a co-employee and accused AutoZone management of being aware of the harassment and doing nothing to stop it. The plaintiff stated that he had been physically harassed by his co-worker "'at least [twenty] times, maybe a couple of dozen' in all" and that he reported her "as many as twenty times between March and August 2013." *Id.* at 261. The plaintiff in *Ward* reported the sexual harassment to multiple managers. One manager admonished the offending employee, but also told the plaintiff to "knock it off," although no one had accused the plaintiff of any misconduct. *Id.* That same manager reported the harassment to a higher manager, but the higher manager did nothing. *Id.* When the plaintiff reported the harassment another time to the same manager, the manager just "sh[ook] his head" in response to the plaintiff's complaint. *Id.* The plaintiff quit before higher management instituted a plan to prevent further harassment. *Id.* The plaintiff sued AutoZone alleging a hostile work environment on the basis of his sex, constructive discharge, and retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), as well as IIED under North Carolina law. *Id.* at 262. The district court granted summary judgment in favor of AutoZone on the plaintiff's constructive discharge claim, but the remaining claims proceeded to trial. *Id.*

The jury found AutoZone liable for creating a hostile work environment and intentional infliction of emotional distress, and awarded both compensatory and punitive damages. On appeal, the Fourth Circuit reversed the award of punitive damages. In doing so, the court summarized the standard for punitive damages as follows:

> Title VII authorizes punitive damages only when a plaintiff makes two showings. First, the plaintiff must show that the employer "engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) . . . ." 42 U.S.C. § 1981a(a)(1). Second, the plaintiff must show

that the employer engaged in the discriminatory practice "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). That is, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law[.]" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999).

When a plaintiff relies on vicarious liability to hold an employer liable for punitive damages under Title VII, . . . , he must do so under traditional principles of agency law. Agency law provides only four ways an employer can be held vicariously liable for punitive damages based on the act of an employee: (1) when the employer authorizes the employee's tortious act; (2) when an employee is unfit and the employer acts recklessly in employing the employee; (3) when the employee served in a managerial capacity and was acting within the scope of employment; or (4) when the employer or managerial agent of the employer ratified or approved the act.

*Id.* at 542-43. This same standard applies to claims for punitive damages under Section 1981. *See Kolstad*, 527 U.S. at 535-36; *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 441 (4th Cir. 2000).

The Fourth Circuit held that the record in *Ward* did not support an award of punitive damages. After analyzing which employees served in a managerial capacity, the court held that the plaintiff had failed to present evidence that the relevant managerial employees engaged in any intentional discrimination themselves. *Id.* at 267 (distinguishing *Kolstad* and *Lowery* by noting that those cases support an employer's vicarious liability for punitive damages when the manager carries out the intentional discrimination). The Fourth Circuit stated that the managerial employees in *Ward* "at most, failed to adequately respond to discrimination by a lower level non-managerial employee," which was insufficient to support an award of punitive damages. *Id.* at 268.

Similar to *Ward*, the evidence Knox and the EEOC have presented concerning the managers' role in the discrimination was their response to Knox's complaints about Bishop. Knox testified that all racial remarks and bad behavior directed to her were committed solely by Bishop and no other employees at Lancaster's. Of the two prior racial instances in which Knox claims that she reported Bishop for having subjected her to a racially-hostile work environment, one involved a

manager stating that he would "handle it" and the other incident involved Knox merely *asking* a manager whether she thought Bishop was racist without providing any specifics about Bishop's actions towards her. While the EEOC and Knox point to Bishop's rehiring in their argument for punitive damages, the offending employee in *Ward*, unlike Bishop, was never terminated from the job. In fact, Bishop was much more severely reprimanded than the offending employee in *Ward*. Not only was Bishop fired, but he was also placed on six months' probation when he was rehired. Thus, the fact that Bishop was hired again in 2017 does not create a genuine issue of material fact as to whether Lancaster's discriminated against Knox "with malice or with reckless indifference to [her] federally protected rights." *See* 42 U.S.C. § 1981a(b)(1).

As *Ward* notes, "[i]in certain circumstances, punitive damages may be appropriate where a managerial employee is apprised of a discriminatory situation, yet responds with reckless indifference to it despite his or her knowledge of the claim." *Id.* at 267. The Fourth Circuit went on to discuss *EEOC v. Federal Express*, 513 F.3d 360 (4th Cir. 2008), where it upheld an award of punitive damages on this theory. In *Federal Express*, the managerial employee knew of his obligation under the Americans with Disabilities Act to provide reasonable accommodations for an employee's disability, but repeatedly denied certain accommodations and prevented other supervisors from taking steps towards implementing accommodations. Again, the Fourth Circuit pointed out that in *Federal Express* "the managerial employee was the employee directly involved in the discrimination—which in a Title VII ADA case is the decision about whether to provide accommodations." *Id.* at 267. The Fourth Circuit found this to be a "critical" distinction between the facts in *Federal Express* and *Ward*.

The evidence of the managerial employees' actions at Lancaster's are not the type of "recklessly indifferent" action seen in *Federal Express*. Unlike the manager in *Federal Express*,

the managers at Lancaster's never actively engaged in the discrimination. As in *Ward*, the managerial employees at Lancaster's, "at most, failed to adequately respond to discrimination by a lower level non-managerial employee," which is insufficient to support an award of punitive damages. *Id.* at 268.

The EEOC and Knox pursue vicarious liability not only under the managerial-capacity theory, but also through the ratification theory.[4] While the plaintiff in *Ward* pursued vicarious liability under only the managerial-capacity theory, the Fourth Circuit noted that the record in *Ward* did not appear to support *any* of the four theories. *Id.* at 269 n.6. Here, as discussed above, the evidence does not support an award of punitive damages under the ratification theory. The record shows that Bishop was rebuked when managerial employees became aware of his conduct. For example, Bishop was "counseled" at least twice after the incident with the kitchen staff and told never to use the same language again. And, Bishop was immediately terminated after the January 20, 2017 incident. Even if Davis took no action despite telling Knox that he would "handle it" when she reported Bishop's conduct to him, this alone is insufficient for punitive damages. Further, Knox's question to Dave regarding whether Bishop was a racist did not alert Dave to any specific action by Bishop as Knox gave no details nor did she elaborate on Bishop's conduct. There is no other

---

[4] Counsel for the EEOC stated at oral argument that, had the EEOC had the benefit of *Ward* when briefing its argument, it would have argued vicarious liability under the theory of reckless employment. However, the Supreme Court identified this theory as a theory of liability in *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 542 (1999), and as such, that theory of liability was available for counsel to argue without *Ward*. Regardless, the record does not show that Bishop was an unfit employee and that Lancaster's was reckless in rehiring him after his termination in 2016. At oral argument, counsel for EEOC pointed to the incident with Lancaster's kitchen staff as evidence of reckless hiring. However, when asked if Bishop continued his actions after being spoken to by management about the incident, counsel stated that he began using the term again, but only after he was re-hired in 2017 and after Knox claims she was constructively discharged. This is insufficient evidence to create a genuine issue of material fact as to whether Lancaster's recklessly hired Bishop in 2016, when there was no indication that Bishop continued to use racial slurs at that time.

evidence in the record about the four other times Knox claims she reported Bishop's conduct to management. While one may argue that Lancaster's should have done more to stop Bishop's actions (and the jury will decide whether Lancaster's should be liable for compensatory damages based on the evidence at trial), the record does not show that punitive damages are appropriate.

When asked at oral argument if counsel could point to a federal case with very close or similar facts where punitive damages have been allowed, counsel for the EEOC was hard-pressed to identify a case. She admitted that she would have to do more research and offered to submit supplemental authority by the close of business the following day. Counsel submitted two cases— one from the Sixth Circuit and one from the Tenth Circuit. *See Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir. 1985); *Deters v. Equifax Credit Info. Servs.*, 202 F.3d 1262 (10th Cir. 2000). However, in both cases the response by management was much more egregious than what is present in this case.

In *Erebia*, the plaintiff repeatedly complained to management about a co-worker making ethnic and racial slurs on nearly a daily basis over the course of five years. The managers did nothing in response to the plaintiff's complaints and told the plaintiff to ignore it. At one point, a manager even told the plaintiff that he was a "hot-head" and threatened to do him economic harm if he complained further about his co-worker's actions. The Sixth Circuit allowed punitive damages in the case noting, "[m]anagement was aware of plaintiff's many complaints of harassment and condoned the situation by taking no steps to improve conditions and by seeking to intimidate plaintiff." *Erebia*, 772 F.2d at 1258. Additionally, the Sixth Circuit emphasized that the defendant presented no evidence to contradict the plaintiff's claims.

Similarly, in *Deters*, the plaintiff made routine complaints to her supervisors about her co-worker's harassment. 202 F.3d 1262. The plaintiff was told that management would take care of

it, but at other times, management told her that she would have to tolerate the name calling and the language, claiming the harassment was just a by-product of the personality of debt collectors, and told the plaintiff that she was "reading too much into it" when the plaintiff reported that the co-worker had groped her. *Id.* at 1269. Evidence was also introduced that the plaintiff described to her superior's in "excruciating detail" the nature of the sexual harassment and that at some points a manager even witnessed the harassment but did nothing about it. *Id.*

In sum, while a reasonable jury may find that Lancaster's is liable for compensatory damages, the record does not support a claim for punitive damages under Title VII as a matter of law.

   *ii. North Carolina Law*

Knox also asks for punitive damages for her state law claims.[5] Under North Carolina law, a plaintiff may recover punitive damages in certain limited circumstances. North Carolina General Statutes Section 1D-15(a) provides:

> Punitive damages may be awarded only if the claimant proves the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
> (1) Fraud.
> (2) Malice.
> (3) Willful or wanton conduct.

N.C. Gen. Stat. § 1D-15(a). The existence of an aggravating factor must be proved by clear and convincing evidence. N.C. Gen. Stat. § 1D-15(b). Punitive damages may only be awarded against a corporation if "the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." N.C. Gen. Stat. § 1D-15(c).

---

[5] Knox's only remaining state law claim is for negligent hiring, retention, and supervision. Lancaster's did not move for summary judgment on this claim.

The Fourth Circuit has noted two distinct differences from the standard for punitive damages under Title VII and punitive damages under North Carolina law. "First, the burden of proof for proving punitive damages under North Carolina law is higher than the burden of proof for proving punitive damages under Title VII." *Ward*, 958 F.3d at 270. While under Title VII, reckless indifference need only be proved by a preponderance of the evidence, North Carolina law requires clear and convincing evidence. *See id.*

"Second, North Carolina's definition of willful or wanton conduct differs markedly from Title VII's definition of reckless indifference." *Id.* at 270. Under North Carolina law, Chapter 1D defines willful or wanton conduct as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm. 'Willful or wanton conduct' means more than gross negligence." N.C. Gen. Stat. § 1D-5(7); *see also Shaw v. Goodyear Tire & Rubber Co.*, 737 S.E.2d 168, 173 (N.C. Ct. App. 2013) (stating that willful or wanton conduct is more than mere carelessness or recklessness).

The record does not show that the relevant managerial employees consciously disregarded Knox's rights. As described above, the evidence reflects that the managerial employees acted in some fashion to address Knox's concerns by terminating Bishop, believing Knox's side of the story, and by apologizing to Knox and asking her to come back to work. Especially given that Knox can only recall two specific instances where she reported Bishop's racist actions to management, and only one of those times did she describe the specifics of Bishop's conduct, there is insufficient evidence in which a reasonable jury could be "fully convinced" that the managers participated in or condoned willful or wanton conduct as required under North Carolina law. *See Ward*, 958 F.3d at 271 (holding that a the "record evidence, even viewed most favorably to Ward,

does not 'fully convince' that [managerial employees] participated in or condoned willful or wanton conduct under North Carolina law").

## IV.    ORDER

**IT IS THEREFORE ORDERED** that Lancaster's partial motions for summary judgment (Doc. Nos. 30, 31) are **GRANTED**. The EEOC's and Knox's claims for punitive damages, as well as Knox's claims for battery and IIED against Lancaster's, are **DISMISSED**. Trial shall proceed on the EEOC's and Knox's remaining claims.

**SO ORDERED.**

Signed: June 12, 2020

Kenneth D. Bell
United States District Judge